UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Lubrila Ford,

                              Plaintiff,

      v.

Commissioner of Social Security,

                              Defendant.

**Report and Recommendation**

16-CV-657A

_____

**I.     INTRODUCTION**

District Judge Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 18.)  Pending before the Court are motions, by plaintiff Lubrila Ford ("Ford") and defendant the Commissioner of Social Security ("Commissioner"), for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 17, 24.)  Ford seeks review of a denial of her application for Title XVI Supplemental Security Income ("SSI") benefits. Ford believes that the Commissioner gave insufficient consideration to a treating physician who managed her chronic lower back and ankle pain and who deemed her temporarily totally disabled after a car accident in 2013.  The Commissioner responds that medication has kept Ford's pain under control; that Ford maintained the ability to engage in household activities and even part-time employment; and that any opinion about total disability came about for no-fault purposes, was outdated by medical records post-dating 2013, and in any event addressed an ultimate issue reserved to the Social Security Administration.

The Court has deemed the motions submitted on papers under FRCP 78(b). For the reasons below, the Court respectfully recommends granting the Commissioner's motion and denying Ford's cross-motion.

## II. BACKGROUND

### A. *Medical and Factual Background*

The certified administrative record for this case contains numerous medical records, but the issues that Ford has raised draw particular attention to the records of treatment provider Dr. Michael Calabrese. What follows is a brief summary of Dr. Calabrese's records.

Ford was involved in a car accident on November 16, 2013; an x-ray taken that day showed an unremarkable left shoulder. (Certified administrative record, Dkt. No. 7, at 639, hereafter denoted as [639].) An examination six days later, on November 22, 2013, led to numerous diagnoses including probable disc herniations and radiculopathy. [651.] On December 19, 2013, an evaluation noted continuing radiating pain into Ford's fingers causing weakness, numbness, tingling, and burning. [662.] MRI scans taken on January 9, 2014 showed disc herniations at multiple locations. [666.] As of February 18, 2014, Ford continued to report significant pain but also reported that medication helped to manage the pain and to let her perform activities of daily living. [690.] Ford denied anxiety or depression at that time. [690.] A report dated March 17, 2014 noted the need to rule out possible cervical radiculopathy. [701.] In a report dated March 18, 2014, Dr. Calabrese offered the opinion that Ford was temporarily totally impaired due to her car accident several months earlier. [713.] As of April 22, 2014, Ford reported some feelings of anxiety and depression but also reported that medication was effective in decreasing her pain and improving her activities of daily living. [714.] On May 22, 2014, Ford denied feelings of anxiety or depression; she reported significant pain that was controlled by medication, which she took only as needed. [719.] As for

2

opinions, Dr. Calabrese in May 2014 revised his opinion to label Ford as temporarily partially impaired. [723.] An update on June 24, 2014 added the improvement that Ford "recently started working part-time as a companion to an elderly woman. She states that she can tolerate these duties well and is happy to be doing some sort of work activity." [724.] Three months later, on September 23, 2014, Ford reported some anxiety and depression as well as continuing significant pain that medication was able to control. [739.] On October 23, 2014, Ford quantified the impact of medication by saying that her medications "are helpful in decreasing her pain by at least 50%, thereby allowing improved daily functioning. She continues to work as a private home health aide and is tolerating her duties well and within her physical abilities." [744.] A report from January 20, 2015 had Ford reporting that she was "quite incapacitated" with pain but that medication was very helpful in decreasing that pain. [758.] Range of motion and household activities were "significantly limited," but Ford also was "looking for new job opportunities where she could do private home health aide [work] which would be more of a sedentary position." [758.] Dr. Calabrese noted tests that revealed active left L4 radiculopathy. [759.] A report from February 19, 2015 showed increased symptoms with cold weather and continued anxiety, depression, and radiculopathy. [763.] As of March 19, 2015, significant pain continued as did some level of employment as a personal aide. [768.] An orthopedic examination from March 24, 2015 noted a mild narrowing of cervical disc space and some other degenerative spinal changes but was silent as to radiculopathy. [781–82.] Ford's situation remained more or less the same as of April 28, 2015. [773.]

### B. Procedural Background

Ford filed her application for SSI on October 9, 2008, claiming a date of disability onset of August 11, 2007. [17, 109–12.] The Commissioner denied Ford's claim on March 23, 2009. [57–64.] Ford then requested a hearing before an Administrative Law Judge ("ALJ"). [65–67.]

The hearing occurred on August 23, 2010. At the hearing, Ford testified about her lifting limitations and about her medications. [36.] Ford testified about her high blood pressure and dizziness. [37–38.] A chronic ankle injury dated back to August 2007 and resulted from a domestic violence assault. [44.] According to Ford, she can sit or stand for about 45 minutes to an hour at a time, as long as she changes positions. [48.] A Vocational Expert ("VE") testified as well. The ALJ posed the following hypothetical to the VE:

> First instance, individual could do the full range of light work but would need a sit-stand option after about 60 minutes. Any questions about that hypothetical?
>
> A. No.
>
> Q. If I took that hypothetical person and, as I said, considered Ms. Ford's age and education, since there's no past relevant work, [are] there any jobs that hypothetical person could do in the national, regional economy and if so could you give me some examples?
>
> A. Yes, sir. Example would be that of a bench assembler. She'd be restricted to unskilled work.

[52.] The ALJ then posed a modified hypothetical to the VE:

> Q. Okay, let's take it—the next hypothetical, take it down one exertional level to sedentary with the same sit-stand option.
>
> A. Okay.
>
> Q. Any—any—I was—any questions about what I just posed with this sedentary with sit/stand option?
>
> A. No.
>
> Q. Okay. Can you tell me if there [are] any jobs that hypothetical person could do?
>
> A. Yes. There are assembler jobs. This is final assembler, DOT code 713.687-018. Sedentary, unskilled with SVP of 2, meaning that they lift no more than ten pounds occasionally, less weight frequently. This kind of assembler work is also done at an elevated table or a bench so you could either do it seated or standing. In the region there are about 80 such jobs and in the nation about 95,000 such jobs.

4

    Q. Okay.

    A. There's also inspection jobs. This is a dowel inspector, D—dowel inspector is DOT code 669.687-014. Sedentary, unskilled with an SVP of 2. There are about 90 such jobs in the region and approximately 97,000 such jobs in the nation.

[53–54.] Ford's attorney then posed an additional modification to the VE:

    Q. Well, I guess applying this to both hypothetical individuals elevating the legs for an hour during the daytime beyond work breaks?

    A. That would eliminate the jobs identified in hypothetical one and two, and in fact I think it's inconsistent with all unskilled, entry-level employment and that this would require the person to remove themself [phonetic] from the work environment—

    Q. Mm-hmm.

    A. —to take a break. And if they needed to do that on regular basis of more than once a month—

    Q. Mm-hmm.

    A. —about 12 times a year, then that's grounds for them being fired. So they might be able to get a job but wouldn't be able to keep the job.

[55.] Pursuant to a prior remand,[1] a supplemental hearing occurred on November 16, 2015. [434.] At the supplemental hearing, there was some concern about the accuracy of documents indicating how much Ford had worked since 2004. [440.] Ford provided additional details about why she believes she is unable to work. [441.] Ford also disagreed with Dr. Calabrese's assessment that she could perform sedentary work:

    Q. And Dr. Calabrese has said he thought you could return to, kind of, sedentary work but to do duties within your own ability and as tolerated. So, if you— why wouldn't you be able to do even, kind of, a sit down job?

    A. Like I was explaining, the pain that comes, there's no way out. I'll be sitting there in pain and tolerating it. And then, with the medication, the effects of the

---

[1] *See generally Ford v. Astrue*, No. 12-CV-301, Dkt. Nos. 18–20 (W.D.N.Y.).

>   medication, no.

[448.] The VE then addressed a new set of four hypotheticals. The first hypothetical was as follows:

>   The first one I have an individual who can do the full range of light work but would need a sit/stand option after 60 minutes. In other words, if you're standing for 60 minutes, you need to sit down. If you're sitting for 60 minutes, have the opportunity to stand up. Do you have any questions about that hypothetical?
>
>   A. No, sir.
>
>   Q. Okay. Can you—do—taking that hypothetical person, with the claimant's age and education, are there any jobs that hypothetical person could do in the national or regional—or just the national economy?
>
>   A. Yes. There's assembly work that's done at an elevated table or a bench and it's a required practice to provide the worker with a stool. So, as long as they stay at the workstation, they can do the work either seated or standing.

[456–57.] The ALJ next posed this hypothetical:

>   Q. Okay. One other hypothetical. In this hypothetical, the individual's limited to the sedentary range of work with the need to avoid all exposure to extreme cold and wetness. Any questions about that hypothetical?
>
>   A. No, sir.
>
>   Q. Okay. And again, the same questions. The younger individual with the less than high school education. Could that person do any work in the national economy? And if so, can you give me at least two examples?
>
>   A. Yes. That's consistent with sedentary exertion, unskilled work. Example would be charge account clerk, DOT code 205.367-014. Sedentary in exertion, unskilled, with an SVP 2. I think is consistent with the restrictions of that hypothetical.

[458.] Ford's counsel presented the VE with the last two hypotheticals:

>   Q. Let me give you a third hypo. Mr. Janikowski—or Dr. Janikowski, for either the first or second hypothetical, we're looking at light or sedentary, would these jobs allow for an individual during the day to elevate one of their legs up to an occasional basis during the workday?

> A. It's my opinion that these jobs would allow for an elevation of about six inches or so, but not much more than that. Anything higher than that, pushes the worker away from [the] workstation and that becomes problematic. So, only a limited amount of foot elevation's allowable.
>
> Q. So, if they were elevated at least waist height, that would take them over that amount?
>
> A. Yes.
>
> Q. Okay. Let me give you a fo[u]rth hypothetical. If the individual was limited to sedentary work, but during the day would be off-task at least two hours to lay down, could they maintain full-time, sedentary employment?
>
> A. No. That's—that would be an excessive amount of unscheduled break time when she's removing herself from the workstation. Employers generally allow unscheduled additional breaks about one time per month, 12 times in the course of a year. And she'd be doing it on a daily basis. So, she wouldn't be able to hold down a full-time job with that restriction.

[460–61.]

The ALJ issued an unfavorable decision on June 13, 2016. (Dkt. No. 14.) The ALJ decided that Ford had several severe impairments: "status post ankle fracture and open reduction internal fixation (ORIF) surgery, derangement of the cervical, thoracic, and lumbar spine, radiculopathy along the L4 nerve distribution, obesity, and chronic obstructive pulmonary disease/asthmatic bronchitis." (*Id.* at 8.) The ALJ found insufficient evidence to include anxiety and depression with Ford's other severe impairments. (*Id.* at 9.) Additionally, the ALJ concluded that none of Ford's severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ considered Listings 1.02, 1.04, 3.00, 3.02, and 3.03. (*Id.* at 9–10.) When assessing Residual Functional Capacity ("RFC"), the ALJ concluded that Ford "had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she required a sit/stand option after 60 minutes . . . . [F]rom December 1, 2013 through the present, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work

7

as defined in 20 CFR 416.967(a) but must avoid all exposure to extreme cold and wetness." (*Id.* at 10.)  Among other points considered, the ALJ assessed Ford's relationship with Dr. Calabrese.  With respect to Dr. Calabrese's records from 2010, "[r]educed range of motion and tenderness to palpation were noted in the lumbar spine in March 2010, as well as mild swelling in the left ankle, but the claimant stated that medications decreased her pain, and she had not recently seen Dr. Stoeckl." (*Id.* at 12.)  Ford saw Dr. Calabrese in late 2013 after a car accident; after summarizing Dr. Calabrese's clinical findings, the ALJ had this to say about the doctor's conclusions:

> Dr. Calabrese prescribed pain medication, physical therapy, chiropractic evaluation, acupuncture, and an orthopedic referral.  He stated that the claimant could not "return" to her employment and remained temporarily totally impaired due to the car accident.  Minimal weight is accorded to this opinion because it was rendered for no fault purposes and not Social Security, is not a function by function analysis, and was composed shortly after an acute injury, without reference to the durational expectation of the claimant's impaired condition.

(*Id.* at 13.)  "In June 2014 the claimant confirmed to Dr. Calabrese that she had taken a part time job as a companion to an elderly woman.  The claimant told Dr. Calabrese that she can tolerate these duties well and is happy to be doing some sort of work activity.  She wishes that she had more patients that she could also help in the same way." (*Id.* (internal quotation marks and citations omitted).)  The ALJ made this final observation from Dr. Calabrese's records:

> Dr. Calabrese opined at numerous points in 2014 and 2015 that the claimant was cleared to return to sedentary exertional work (Exs. 26F and 27F).  Significant weight is accorded to these opinions due to the long term treatment relationship, the consistent clinical findings, and the claimant's admission that she was performing sedentary work and sought to increase her duties.

(*Id.* at 15–16.)  The ALJ concluded that jobs existed in significant numbers in the national economy that Ford could perform; the ALJ listed representative examples. (*Id.* at 17.)

Ford commenced this case by filing her summons and complaint on August 15, 2016. (Dkt. No. 1.)  Ford then filed her pending motion on September 29, 2017. (Dkt. No. 17.)  In support of

8

her motion, Ford has focused on how the ALJ evaluated Dr. Calabrese's opinions:

> The ALJ failed to evaluate the opinions of Plaintiff's treating pain specialist Dr. Calabrese on an even playing field. Dr. Calabrese was providing treatment as part of Plaintiff's no fault claim stemming from her November 2013 car accident. From November 2013 to May 2014, Dr. Calabrese opined that Plaintiff was temporarily totally impaired. (Tr. 647; 660; 679; 708; 713). The ALJ indicated he gave this opinion little weight because it was rendered for the purposes of no fault, was not a function by function assessment, and was composed after an acute injury. (Tr. 910). However, when Dr. Calabrese offered a different opinion, that Plaintiff could perform sedentary work with "duties performed within her own abilities and as tolerated" (tr. 718), the ALJ gave this opinion "significant weight." (Tr. 912-913). However, this opinion was also rendered for the purposes of no fault, and also was not a function by function assessment. Why did the ALJ reject Dr. Calabrese's opinion when it supported total disability, but adopt his opinion when it possibly supported some level of work?

(Dkt. No. 17-1 at 13–14.) "Moreover, without a function by function assessment, there is no way to know that the 'sedentary' exertion identified by Dr. Calabrese was in any way consistent with 'sedentary' under Social Security regulations." (*Id.* at 14.) Ford makes the additional point that "[t]he ALJ should have determined whether or not Plaintiff's left shoulder injuries and diagnoses would interfere with her ability to perform the full range of sedentary work." (*Id.* at 15.)

The Commissioner filed the corresponding cross-motion on January 17, 2018. (Dkt. No. 24.) The Commissioner defends the ALJ's determination by noting Ford's clinical improvement even after her car accident:

> At the time of her November 2013 car accident, Plaintiff walked with a steady gait and had normal reflexes and sensation (Tr. 641, 910). A few months later, Plaintiff's lumbar ROM was moderately diminished, but a nerve conduction study ruled out cervical neurological issues and examination revealed full muscle strength (Tr. 694-96, 910). One year after the accident, Plaintiff's objective findings were stable, and she was cleared to return to sedentary work "within her own abilities and as tolerated" (Tr. 739-43, 911). As of March 2015, Plaintiff could walk normally without an assistive device, could stand on heels and toes with good balance and coordination, and displayed full strength and intact sensation in her upper and lower extremities (Tr. 626, 911). Cervical, thoracic, and lumbar x-rays revealed good bone quality, with no fractures or instability (Tr. 627).

(Dkt. No. 24-1 at 14.)  The Commissioner has indicated that Ford did not always comply with suggestions from her treatment providers but always improved when she did.  (*Id.* at 16.)  According to the Commissioner, Ford herself has indicated an ability to perform daily household activities and to engage in sporadic employment.  (*Id.* at 17.)  Finally, the Commissioner asserts that Dr. Calabrese cleared Ford to engage in sedentary work.  (*Id.* at 21.)  For these reasons, the Commissioner concludes that the ALJ properly gave additional weight to opinions from treatment providers indicating that Ford was not totally disabled.

### III.   DISCUSSION
#### A.   *Standard of Review Generally*

The ultimate issue to be determined by this Court is whether the ALJ's decision that Ford was not under a disability is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991).  Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For purposes of Social Security disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other

10

kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Ford bears the initial burden of showing that her impairments prevent her from returning to her previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether any plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

    (1) whether the plaintiff is currently working;

    (2) whether the plaintiff suffers from a severe impairment;

    (3) whether the impairment is listed in Appendix 1 of the relevant regulations;

    (4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

    (5) whether the impairment prevents the plaintiff from continuing her past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work that she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work given her residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

### B.   Weight Given to Dr. Calabrese's Records and Opinions

Based on what Ford has raised in her motion papers, the sole issue that the Court has to consider is whether substantial evidence supports how the ALJ assessed medical information from Dr. Calabrese. "Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). When "a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.* "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's

attention that tend to support or contradict the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted).

Here, the ALJ's determinations were consistent with Dr. Calabrese's records. The ALJ acknowledged multiple severe impairments, including impairments that would have caused the pain that Ford regularly reported to Dr. Calabrese. The closest, however, that Ford came to meeting a formal medical listing was through the diagnosis of L4 radiculopathy. Radiculopathy by itself does not meet all the criteria of Listing 1.04. *See, e.g., McKinney v. Astrue*, No. 505-CV-0174 LEK/GHL, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1, 2008); *Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006). Other aspects of Dr. Calabrese's records show consistently through 2015 that Ford, though in pain, was able to manage that pain through medication. *Cf., e.g., Sabater v. Colvin*, No. 12CV4594KMKJCM, 2016 WL 1047080, at *5 (S.D.N.Y. Mar. 10, 2016) ("Both the ALJ and Judge McCarthy correctly note that Plaintiff's own testimony of 'good pain management' directly contradicts the treating physicians' opinions that he 'was totally disabled due to constant and extreme pain.'") (docket citations omitted); *Hollaway v. Colvin*, No. 14CIV5165RAHBP, 2016 WL 96172, at *22 (S.D.N.Y. Jan. 8, 2016) ("[T]he ALJ analyzed the Beth Israel medical records extensively and noted that the Beth Israel staff reported that plaintiff was managing his back pain with medication."), *report and recommendation adopted*, No. 14-CV-5165(RA), 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016). The records show further that Ford was capable of ambulation, household activities, and even some employment in the form of a personal aide. *Cf., e.g., Fillmore v. Colvin*, 286 F. Supp. 3d 536, 538 (W.D.N.Y. 2017)(noting "reports by both Dr. Whitbeck and plaintiff herself that plaintiff was able to engage in a variety of household activities, including performing chores, taking care of pets, shopping and gardening" as a basis for denial of benefits); *Orkins v. Astrue*, No. 2:12-CV-68, 2012 WL 6838964, at *12 (D. Vt. Dec. 21, 2012) ("For example, at

the August 2011 administrative hearing, Orkins testified that he keeps a daily planner, uses a cell phone for scheduling and texting, goes to the movies and out to dinner with his girlfriend, takes his girlfriend's boss's children to the park, and does household chores."), *report and recommendation adopted*, No. 2:12-CV-68, 2013 WL 139255 (D. Vt. Jan. 10, 2013).  The sedentary jobs that the VE suggested would be available to Ford are not inconsistent with the mobility and employment history indicated in Dr. Calabrese's records.  Under these circumstances, substantial evidence supported the ALJ's findings, and the ALJ had discretion to disregard opinions of disability from Dr. Calabrese that were older and that addressed an ultimate issue reserved to the Commissioner.  *See, e.g., Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting the Commissioner's motion (Dkt. No. 24) and denying Ford's cross-motion (Dkt. No. 17).

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  FRCP 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's

report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

                                                                                                    */s Hugh B. Scott*
                                                                                                     Hon. Hugh B. Scott
                                                                                                   United States Magistrate Judge

DATED: May 1, 2018